# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

| | |
|---|---|
| ANTHONY MARCANTONIO. | CASE NO. 3:15-cv-00029 |
| *Plaintiff*, | |
| v. | MEMORANDUM OPINION |
| KYLE DUDZINSKI *ET AL.*, | JUDGE NORMAN K. MOON |
| *Defendants*. | |

This case is before the Court after briefing and oral argument on Defendants' motions to dismiss for failure to state a claim.  Anthony Marcantonio ("Plaintiff") filed this diversity action against former teammates on the University of Virginia ("UVA") men's swim team for several torts under Virginia law.[1]  Generally, Plaintiff alleges that Defendants subjected him to assorted forms of hazing, threats, verbal abuse, intimidation, and unwanted touching or limitations on his physical movement.  The crux of the Complaint is the purported "hazing" of new swim team members by upperclassmen that took place one evening at an off-campus residence known as the "Swim House."  Plaintiff also contends that, as part of Defendants' effort to cover up their alleged misdeeds, they retaliated against him such that he no longer continued swimming for UVA and left the school.

There are five defendants, all of whom have filed a motion to dismiss: Kyle Dudzinski; Luke Papendick; Charles Rommel; David Ingraham; and Jacob Pearce.  The Complaint alleges

---

[1]      Subject matter jurisdiction is proper.  The amount in controversy is alleged to exceed $75,000.00.  Plaintiff is a citizen of Massachusetts, while Defendants are alleged to be citizens of the following other states:  Pennsylvania, Michigan, New Jersey, Virginia, New York, South Carolina, and Oklahoma.  Compl. ¶¶ 2-8.

ten counts, all against each Defendant, for assault, battery, false imprisonment, hazing, tortious interference with contractual relations, intentional infliction of emotional distress, punitive damages, common law and statutory conspiracy, and negligence. For the reasons discussed below, the motions to dismiss will be granted in part and denied in part.

## STANDARD OF REVIEW

A Rule 12(b)(6) motion to dismiss merely tests the legal sufficiency of a complaint to determine whether the plaintiff has properly stated a claim; "it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin,* 980 F.2d 943, 952 (4th Cir. 1992). Although a complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (internal citations omitted). A court need not "accept the legal conclusions drawn from the facts" or "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Eastern Shore Markets, Inc. v. J.D. Assocs. Ltd. P'ship,* 213 F.3d 175, 180 (4th Cir. 2000). "Factual allegations must be enough to raise a right to relief above the speculative level," *Twombly,* 550 U.S. at 555, with all allegations in the complaint taken as true and all reasonable inferences drawn in the plaintiff's favor. *Chao v. Rivendell Woods, Inc.,* 415 F.3d 342, 346 (4th Cir. 2005). Rule 12(b)(6) does "not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 570.

## FACTS AS ALLEGED

### Plaintiff's Background and Matriculation to UVA

Plaintiff Anthony Marcantonio graduated high school in 2013 as an honor student.

– 2 –

Compl. ¶ 11.  During his high school days, he excelled in competitive swimming, devoting many morning, evenings, and weekends to practice and eventually developing a national reputation in the amateur swimming community due to his exploits.  Compl. ¶¶ 12-14.  Consequently, several universities recruited him for their respective swim teams, and Plaintiff welcomed the opportunity to attend a top-flight academic institution with a swimming team he hoped could springboard him into the world of professional or Olympic swimming.  Compl. ¶¶ 14-16.

The University of Virginia, Plaintiff believed, presented such an opportunity.  UVA's swimming coach impressed Plaintiff, who was particularly enamored with the supportive environment surrounding the team.  Compl. ¶ 17.  The "anti-hazing" policy in UVA's Student Handbook—which forbade "any action . . . by members of a student organization towards [another] member[] . . . designed to or produc[ing] mental or physical harassment, discomfort, or ridicule"—also appealed to Plaintiff, as did the provision of the UVA Standards of Conduct prohibiting hazing and "physical assault."  Compl. ¶ 18.  These aspects, as well as the University's stellar reputation generally and in academics specifically, led Plaintiff to matriculate to UVA in August 2014 to study and to swim.[2]  Compl. ¶¶ 19-20, 22.

### Emails from "Mr. Mean"

After Plaintiff arrived on Grounds, Defendants Dudzinski and Papendick—upperclass members of the swim team—called a meeting of the first-year swimmers and informed them that "team bonding" would take place during a so-called "welcome week."  Compl. ¶ 23.  Shortly thereafter, on the evening of August 26, 2014, Plaintiff received an email from the aptly-named "Mr. Mean," in actuality an email account persona created by Defendants Dudzinski, Papendick,

---

[2]     According to Plaintiff, he "entered into a contract with UVA" to do so.  This is a legal conclusion subject to analysis below.

Rommel, Ingraham, and Pearce. The email—"joint[ly] author[ed]" by "defendants"—was addressed to "[d]earrest [*sic*] shitcuts" (*i.e.*, the first-year swimmers) who Mr. Mean was "fucking embarrassed" to welcome to UVA on account of their being "gender-neutral dick sucks" (whatever that means). Compl. ¶¶ 24, 26(xliii). Mr. Mean emphasized that "what I say, goes," announced that the first event of Welcome Week would commence the next day, and instructed the first-year swimmers to arrive at the appointed time at 1100 Wertland Street, Charlottesville, Virginia. *Id*. True to his moniker, Mr. Mean closed by warning the first-years that (1) if they arrived even one second early or late, he would sodomize their future fiancées in front of them, and (2) if they "tell a soul" about the Swim House rendezvous, they would be sodomized with a "dry ice dildo *we* have packed away," so they better "keep [their] FUCKING MOUTHS SHUT." Compl. ¶ 24 (emphasis added). The next day (but prior to the appointed arrival time), Mr. Mean sent another profane, but much shorter, email to the first-year swimmers moving the appointed meeting time. *Id*.

Plaintiff was "unsure" whether the emails were a joke or whether he should be "concerned or fearful" due to them. Compl. ¶ 25. But he "did not want to appear squeamish" to his teammates, so he arrived at the appointed time to 1100 Wertland Street, known as the "Swim House" because upperclass swimmers lived there. *Id*. What happened next, Plaintiff alleges, "was instigated by the defendants who were the organizers [of] and who participated" in the events at the Swim House. Compl. ¶ 26.

### Events at the Swim House

When Plaintiff arrived, the Swim House's interior was dark except for a strobe light, and "heavy-metal, satanic music" blared. Compl. ¶ 26(i). Once inside, Plaintiff saw another first-year who appeared frightened. Compl. ¶ 26(ii). An upperclassman instructed him to sit down

– 4 –

and to remove his tie and "anything else he didn't want to get wet." Compl. ¶ 26(iii). Defendant Rommel entered the room and yelled at Plaintiff, and Defendant Dudzinski appeared, asking the first-years if they were scared. Compl. ¶¶ 26(iv)-(v). Defendant Ingraham instructed the first-years to say "pussy," and then "defendants" placed buckets on the first-years' heads. Compl. ¶ 26(vii). "Defendants" taunted and insulted them. Compl. ¶ 26(viii). Plaintiff began to fear for his safety. Compl. ¶ 26(ix). "[D]efendants" then removed the buckets, instructing the first-years to assemble in a line and placing them accordingly. Compl. ¶ 26(x). Defendants Dudzinski and Ingraham came "menacingly close" to Plaintiff "with sudden and threatening movements and grunts" during this time. Compl. ¶ 26(xi).

"Defendants" then blindfolded the first-years, including Plaintiff, with dirty ties and cummerbunds and screamed at them to perform an "Elephant Walk" (*i.e.*, to reach between their legs to grab the genitals of the person behind them). Compl. ¶¶ 26(xii)-(xiii). This Elephant Walk procession ambled into a dark bathroom, where Plaintiff "felt closed in" and became disoriented and "more concerned." Compl. ¶ 26(xv). Once inside, Defendant Pearce yelled that the first-years "had one hour" and slammed the door. Compl. ¶ 26(xvi). The first-years turned on the bathroom lights, which revealed several containers of alcohol and other liquids; all methods of pouring out the containers (the sink, toilet, windows, and shower drain) were blocked or duct-taped shut. Compl. ¶ 26(xvii). "Defendants" screamed at the first-years to turn off the lights and unidentified individuals yelled at them to drink all the liquids immediately, lest they "get the dry-ice dildo" treatment for pouring any out. Compl. ¶ 26(xviii). One first-year complained of an injury caused by Defendant Rommel when shards of a glass he shattered on the floor ricocheted into the first-year's eye. Compl. ¶ 26(xix).

For roughly the next hour, "defendants" periodically opened the bathroom door to

– 5 –

demand an empty bottle as proof of consumption. Compl. ¶ 26(xxi). "All first-years who drank the alcohol became intoxicated." Compl. ¶ 26(xxii). Defendants Rommel and Pearce opened the door to shout in obscenities before slamming it closed. Compl. ¶ 26(xxiii). "Defendants" also threw in a questionnaire and a flashlight, and occasionally "a bucket of water would be thrown in." Compl. ¶ 26(xxv). The bathroom became hot and humid because its radiator was turned on. Compl. ¶ 26(xxvi). "[D]efendants" again opened the door, this time ordering the first-years to fill out a questionnaire including both benign identification questions (*e.g.*, name, hometown, birthdate) and offensive/intrusive ones (*e.g.*, favorite sexual position, how "many girls on the women's team have you hooked up with"). Compl. ¶ 26(xxvii). Similar offensive questioning occurred by "[d]efendants" from outside the bathroom, including by Defendant Ingraham of Plaintiff, who fabricated answers and "felt humiliated and ashamed." Compl. ¶ 26(xxviii).

Eventually, "defendants" removed the first-years from the bathroom and "made" them face a corner blindfolded. Compl. ¶ 26(xxix). Plaintiff became "more fearful," believing that "defendants . . . had become drunk and had lost all self-control." Compl. ¶ 26(xxxi). Defendants again interrogated the first-years; Defendant Rommel badgered Plaintiff and instructed him that his name was "Anthony Fucking Weiner." Compl. ¶ 26(xxxv). Meanwhile, "defendants were or were causing others to pour an unknown liquid over his head." Compl. ¶ 26(xxxvi). Rommel asked Plaintiff for the most offensive term for a black person he could think of and, after Plaintiff responded, his blindfold was removed to reveal an African-American in front of him. Compl. ¶ 26(xxxvi). Defendant Rommel responded with jeering jubilation. *Id*. Plaintiff became "delirious and could no longer think clearly." Compl. ¶ 26(xxxviii).

Defendants led the first-years to the back of the Swim House. Compl. ¶ 26(xliii). Plaintiff had previously insisted he did not drink alcohol and therefore was "forced" to drink a

– 6 –

gallon of milk and four glasses of prune juice. Compl. ¶ 26(xliv). As a result, he vomited on the back porch while "defendants" taunted him. *Id*. Defendant Pearce produced a bucket of live goldfish, and "defendants" instructed each first-year to name and then eat them. Compl. ¶ 26(xlv). "[F]earing for his safety," Plaintiff complied, and "defendants" made him prove that he had chewed his goldfish rather than swallowed it whole. *Id*. Plaintiff then received another goldfish to name and to hold in a plastic cup. Compl. ¶ 26(xlvii). But the cup was knocked from Plaintiff's hand, and "defendants" "tried to stomp" the second goldfish to death while yelling at Plaintiff he must try to save it. *Id*. Alas, the goldfish suffered fatal injuries. Compl. ¶ 26(xlviii).

Finally, the first-years were given dirty ties and cummerbunds, instructed that they must wear them for the rest of Welcome Week, and ordered to complete a scavenger list that required the performance of theft, in violation of UVA's Honor Code. Compl. ¶ 26(xlix). After five hours, the Swim House soiree concluded in the early morning of August 28, 2014. Compl. ¶ 27. Plaintiff worried that Defendants "had the power to deprive him of his ability to swim for UVA." *Id*.

### Additional Events and Fallout

In the afternoon of August 28th, Mr. Mean sent another email to Plaintiff and his fellow first-years, this one instructing them—in both profane and insulting language—to save seats at UVA's amphitheatre for an event the next day. Compl. ¶ 30. Plaintiff "felt compelled to comply out of fear" and thus camped out overnight. Compl. ¶ 31.

"[D]efendants" instructed Plaintiff that if he was asked about his teammate's eye injury caused by Defendant Rommel breaking glass, he was to lie. Compl. ¶ 32. Defendant Ingraham interrupted a meeting between Plaintiff and an academic advisor to insist that Plaintiff remove his mandatory tie, for fear that the UVA swim coach would suspect hazing. Compl. ¶ 34.

– 7 –

On September 6, 2014, UVA's swim coach learned of potential hazing problems in the program. Compl. ¶ 36. He questioned all the first-years about the issue, including Plaintiff, who confirmed the events at the Swim House. *Id*. Plaintiff also described the affair to an administrator at UVA two days later. *Id*. Defendants—after learning Plaintiff had disclosed the events at the Swim House—"ostracized and threatened" Plaintiff, who was instructed by his coach to practice apart from his teammates out of concern for his safety. Compl. ¶¶ 37, 39. Plaintiff had to exit the pool whenever his teammates arrived to practice because UVA's swim coach said he "could not guarantee[]" Plaintiff's safety. Compl. ¶ 37. This altered schedule affected Plaintiff's training regimen and, ultimately, he "left the school." Compl. ¶¶ 38-40.

## ANALYSIS

I.     **GENERAL ALLEGATIONS AGAINST "DEFENDANTS" AND THE RULE 12(B)(6) STANDARD**

A common argument made by all Defendants is that the Complaint does not at times specifically identify which defendant (or any defendant) took certain actions, and thus fails to state a claim. This is a valid concern, as the Complaint—whether strategically or out of necessity—contains many vague or ambiguous allegations. There are at least three manifestations of this issue. First, the Complaint often lumps together all "Defendants" without regard for which defendant actually did what. For instance, unspecified "defendants" are alleged to have "put buckets on" Plaintiff's head, taunted and insulted him, placed him in a line, and blindfolded him. Compl. ¶¶ 26(vii), (viii), (x), (xii). Second, the Complaint uses passive voice and omits the identity of the actor (*e.g.*, first-years "were forced" to remain in the bathroom; Plaintiff "was again forced" to sit, "was pushed and shoved back" into his seat, and "was then made to stand up again"). *Id*. ¶¶ 26(xxi), (xxxii), (xxxvii)-(xxxviii). Third, some allegations assert that "upperclassmen" took certain actions (such as telling Plaintiff to sit down and

– 8 –

ordering him to memorize trivia answers, *id*. ¶¶ 26(iii), (xlvi)), an ambiguous term that could encompass Defendants, non-Defendant upperclassmen, or a mix of the two groups.

Although citing and generally discussing *Twombly* and *Iqbal*, the parties have not identified authorities specifically addressing the above pleading practices. In the Fourth Circuit and elsewhere, courts have interpreted *Twombly* and *Iqbal* to mean that generic or general allegations about the conduct of "defendants," without more, fail to state a claim. *E.g.*, *Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008) (use of "collective term 'Defendants'" not proper pleading practice); *Bryson v. Gonzales*, 534 F.3d 1282, 1290 (10th Cir. 2008) ("conclusory allegations that simply name the 'Defendants' generically" fail to state claim); *Raub v. Bowen*, 960 F. Supp. 2d 602, 616 (E.D. Va. 2013) (concluding "vagaries" in "ambiguous" false imprisonment count asserted against "one or more Defendants" warranted dismissal); *Boykin Anchor Co. v. AT&T Corp.*, No. 5:10-CV-591-FL, 2011 WL 1456388, at *4 (E.D.N.C. Apr. 14, 2011) (holding "plaintiff cannot rely on bare allegations relating to the conduct of 'all defendants'"); *Maisha v. Univ. of N. Carolina*, No. 1:12-CV-371, 2013 WL 1232947, at *6 (M.D.N.C. Mar. 27, 2013) (dismissing claims where complaint "was often vague as to who took what action" and made "no specific allegations" against certain defendants); *Baca v. Callahan*, No. CV-10-885-PHX-GMS, 2010 WL 2757251, at *1 (D. Ariz. July 12, 2010) (dismissing complaint against ten defendants that did "little to clarify each Defendant's role in the underlying transaction"); *see also Evans v. Chalmers*, 703 F.3d 636, 661 (4th Cir. 2012) (Wilkinson, J., concurring). Nevertheless, with the exception of Defendant Papendick, the Complaint does supplement its generic or ambiguous references with several specific allegations against Defendants by name. Accordingly, the claims against them will be analyzed further based on the parties' substantive legal arguments.

– 9 –

As for Defendant Papendick, all but the common law conspiracy claim (Count VII) and punitive damages claim (Count IX) against him do not warrant further consideration insofar as they relate to his own personal actions. As Plaintiff admits (dkt. no. 47 at 16 n.5) and unlike with the other Defendants, there are only two substantive allegations against Defendant Papendick by name: he informed the first-year swimmers about Welcome Week, and he was co-creator of the "Mr. Mean" persona. Compl. ¶¶ 23-24. While these facts might support conspiracy and punitive damages claims, the other claims against him fall short based on the aforementioned authorities.[3] *Butler v. Bank of Am., N.A.*, 690 F.3d 959, 961 (8th Cir. 2012) (holding that general allegations against all defendants did not state claim against particular defendant who was specifically referenced only twice in the complaint). The Complaint even lacks any specific allegation that Defendant Papendick was actually present at the Swim House on the night in question, or that he participated in the alleged "cover up" and retaliation against Plaintiff.[4] Accordingly, but for the common law conspiracy and punitive damages counts, all claims against Defendant Papendick will be dismissed to the extent they allege that Papendick himself directly committed them.[5]

## II. COUNT-BY-COUNT ANALYSIS

### 1. Assault

---

[3]     Some claims also fail for additional reasons discussed below.

[4]     At oral argument and in response to questioning from the Court, counsel for Defendant Rommel conceded that all Defendants were present at the Swim House. That statement is not binding on Defendant Papendick.

[5]     In discussing his common law civil conspiracy claim, Plaintiff cites precedent stating that a conspiracy makes co-conspirators liable for each others' torts. Defendants did not respond to this argument, and the Court will not decide it in their favor at this juncture. Thus, the claims against Papendick will be dismissed only to the extent they are made against him as a principal actor, but not to the extent he was an agent or member of the conspiracy to whom co-conspirator liability attaches.

– 10 –

Assault under Virginia law is "an act intended to cause either harmful or offensive contact with another person or apprehension of such contact, and that creates in that other person's mind a reasonable apprehension of an imminent battery." *Koffman v. Garnett*, 265 Va. 12, 16, 574 S.E.2d 258, 261 (Va. 2003). To the extent this claim is based upon the Mr. Mean emails, it falls short. Given the intangible nature of email and the temporal gap between when the emails were received and when Plaintiff arrived at the Swim House, the immediacy required for assault is lacking. Indeed, shouting profanities and threats even in close physical proximity does not constitute assault. *Bennett v. Commonwealth*, 35 Va. App. 442, 449, 546 S.E.2d 209, 212 (Va. Ct. App. 2001) (threatening a "blood bath" within inches of police officers was not assault). Plaintiff's own authority also acknowledges "[t]here can be no assault if the defendant is too far away to commit a battery." *Goforth v. Office Max*, 48 Va. Cir. 463, 1999 WL 33722384, at *6 (Norfolk Cir. Ct. 1999).

There is, however, more to the Complaint that the Mr. Mean emails. Defendants Rommel, Pearce, and Ingraham assert that the facts are insufficient to show an assault. But Rommel frequently screamed, yelled, *and* slammed doors at Plaintiff and others. Compl. ¶¶ 26(iv), (xxiii), (xxiv). He also shattered a glass bottle on the ground at the Swim House, causing shards to fly into another individual's eye.[6] Compl. ¶ 26(xix). Paragraph 26(xi) alleges that Defendants Ingraham and Dudzinski approached Plaintiff and made sudden and threatening movements towards him, which constitutes assault. Defendant Pearce repeatedly slammed shut a door near Plaintiff. Compl. ¶¶ 26(xvi), (xxiii). And all of these facts are supplemented by other general allegations against all Defendants, such as throwing buckets of water at Plaintiff, pouring

---

[6]     The Complaint does not specifically allege that Plaintiff was nearby when this occurred, although it is reasonable to infer he witnessed it.

– 11 –

liquid on him, and threatening sodomy in a "menacing way." Compl. ¶¶ 26(xxv), (xxxvi), 42. Consequently, the Court will not dismiss the assault count against Defendants other than Papendick.

### 2. Battery

"The tort of battery is an unwanted touching which is neither consented to, excused, nor justified." *King v. McMillan*, 594 F.3d 301, 312 (4th Cir. 2010) (holding that reasonable jury could have found compliance with request by supervisor/sheriff for a kiss was not consent). Paragraph 45 of the Complaint summarizes the battery claim. It is based on Defendants placing a garbage can on Plaintiff's head, forcibly blindfolding him, leading him around while blindfolded, forcing him to ingest milk and prune juice, and pouring liquids on his head while blindfolded.

Defendant Dudzinski argues that Plaintiff consented to the alleged touching. He points out that Plaintiff arrived at the Swim House due to his own desire to fit in. Compl. ¶ 25. Nor is there any indication, Dudzinski notes, that Plaintiff objected to the Swim House happenings or at any time tried to leave. Dudzinski argues that Plaintiff's supposed "voluntary participation" in the activity was tantamount to consent. But this argument falters when confronted with the Complaint's allegations that Plaintiff "was delirious and could no longer think clearly," "was afraid for his life," "felt compelled to comply out of fear," and "felt captive and not free to leave." "If consent is coerced or obtained by fraud, the touching is unlawful." *Gnadt v. Commonwealth.*, 27 Va. App. 148, 151, 497 S.E.2d 887, 888 (1998); *see King*, 594 F.3d at 312.[7]

---

[7] Plaintiff goes further in relying on *King*, urging that the "voluntary participation"/coerced-consent issue is one for the jury. While *King* observed that the "question of whether a touching was consented to is for the jury," *id.* at 312, it is inapplicable at this stage. The Fourth Circuit made the statement in *King* when reviewing a defendant's unsuccessful Rule 50(b) motion after an adverse jury verdict. Thus, the issue was whether a jury's findings should

– 12 –

Lack of consent vis-à-vis battery is an element Plaintiff must prove. In "the case of battery, the plaintiff's burden is to show that the defendant intended to and did cause either harm or 'offense,' a burden that ordinarily requires the plaintiff to show that the defendant's touching was not apparently consented to." Dan B. Dobbs, *et al.*, *The Law of Torts* § 34 (2d ed.). Yet the Supreme Court of Virginia has reversed a demurrer dismissing a battery claim where the precise scope of the consent was at issue, *i.e.*, where plaintiff/football player affirmatively alleged he had not consented to being tackled by his adult coach and had no prior notice that such tackling would occur. *Koffman v. Garnett*, 265 Va. 12, 17, 574 S.E.2d 258, 261 (Va. 2003).

Construing the facts and inferences in Plaintiff's favor, the Court is not convinced that Plaintiff's arrival at the Swim House establishes as a matter of law that he consented to all the subsequent touching. Even if his appearance manifested consent to some activities, the scope of that consent is clearly at issue. Further, to the extent his continued presence at the Swim House was consent in a colloquial sense, numerous allegations (*see*, *e.g.*, Compl. ¶¶ 26 (ix), (xxxi), 31) show it was coerced and thus not legal consent under *Gnadt* and *King*.[8]

### 3. False Imprisonment

"False imprisonment is the restraint of one's liberty without any sufficient legal excuse." *Lewis v. Kei*, 281 Va. 715, 724, 708 S.E.2d 884, 890 (Va. 2011); *Parker v. Austin*, -- F. Supp. 3d --, No. 5:14-CV-35, 2015 WL 1925505, at *10 (W.D. Va. Apr. 28, 2015). "If a person is under a reasonable apprehension that force will be used unless he willingly submits, and he does submit

---

be disturbed and were supported by the evidence. *King* did not say that consent is an affirmative defense or that it is exempted from Rule 12(b)(6) scrutiny and must always proceed to the jury.

[8] Defendants Rommel, Pearce, and Ingraham assert that there are no facts against them by name showing they touched Plaintiff. But the Complaint contains allegations that "defendants" harmfully or offensively touched Plaintiff, and—unlike Defendant Papendick—those Defendants are clearly alleged to have been at the Swim House and intricately involved in orchestrating the event. Accordingly, it is reasonable to infer that those Defendants did indeed touch Plaintiff.

– 13 –

to the extent that he is denied freedom of action, this, in legal contemplation, constitutes false imprisonment." *Zayre of Va., Inc. v. Gowdy*, 207 Va. 47, 51, 147 S.E.2d 710, 713 (Va. 1966); *Zaklit v. Global Linguist Solutions, LLC*, 53 F. Supp. 3d 835, 846 (E.D. Va. 2014) (denying motion to dismiss where defendants threatened plaintiffs with arrest for attempting to leave confined area).

Only Defendant Rommel provides extended argument on this Count, although Pearce and Ingraham adopt Rommel's position by reference. In addition to arguing the facts are insufficient, Rommel asserts that the "Complaint sets out no real reason that Plaintiff believed he could not leave, and certainly no reason attributable to Rommel." But the Complaint does allege—in addition to many, more general allegations that constitute false imprisonment by Defendants— that Defendant Rommel "slammed the door shut" of the bathroom that Plaintiff was in and which had all other methods of escape closed off. Compl. ¶¶ 26(xvii), (xviii), (xxiii). Plaintiff also rightly responds to Rommel's argument by citing *Zaklit* for the proposition that submission in the face of a reasonable apprehension of force suffices for imprisonment. Whether based on *Zakit*, the fact that Plaintiff was shut in the bathroom, or any of the other allegations suggesting that Plaintiff felt he could not freely leave the Swim House on account of Defendants' actions, the Complaint states a claim for false imprisonment.

### 4. Hazing

In Virginia, it is "unlawful to haze so as to cause bodily injury, any student at any school, college, or university." Va. Code § 18.2-56. Hazing means:

> to recklessly or intentionally endanger the health or safety of a student or students or to inflict bodily injury on a student or students in connection with or for the purpose of initiation, admission into or affiliation with or as a condition for continued membership in a club, organization, association, fraternity, sorority, or student body regardless of whether the student or students so endangered or injured participated voluntarily in the relevant activity.

– 14 –

*Id.* Hazing is a criminal misdemeanor, but "[a]ny person *receiving bodily injury* by hazing shall have a right to sue, civilly, the person or persons guilty thereof." *Id.* (emphasis added).[9] Only two cases to date cite the statute, neither of which is illustrative here. *Guerrero v. Deane*, 750 F. Supp. 2d 631, 658 (E.D. Va. 2010) *aff'd sub nom. Guerrero v. Moore*, 442 F. App'x 57 (4th Cir. 2011), cites the statute when discussing battery. *Givens v. O'Quinn*, 121 F. App'x 984 (4th Cir. 2005), involved an assault on plaintiff by two co-workers with the Department of Corrections and merely referenced the definition in an inapplicable context.

Defendants' central argument—made most comprehensively by Defendant Pearce—is that Plaintiff did not suffer any "bodily injury."[10] Although that term is undefined in the statute, it is used elsewhere in the Virginia Code as part of the malicious wounding law. Va. Code § 18.2-51. The parties agree that the Court should look to caselaw interpreting the term in that context.

Defendant Pearce contends that any emotional trauma, fear, humiliation, or disorientation Plaintiff felt did not constitute bodily injury, and the Court agrees. He further asserts that

---

[9] At oral argument, counsel for Defendant Pearce made two arguments for the first time, *i.e.*, whether the "guilty thereof" language requires as a precondition to suit that the civil defendant be previously convicted of the offense, and whether a swim team is a "club, organization, association, fraternity, sorority, or student body" within the statutory definition. Although interesting, these arguments were not briefed, Plaintiff had no opportunity to respond to them, and Defendants have provided no citation to authority in support of them. Hence the Court will not pass on them at this time. *See* W.D. Va. L. Civ. R. 11(c)(1).

[10] Defendant Rommel asserts there are no allegations suggesting he "acted in such a way as to 'recklessly or intentionally endanger the health or safety' of Plaintiff, so as to constitute hazing." The contention is not supported by the allegations or the law. The Complaint contains allegations from which one could infer Rommel and the other Defendants were intentionally endangering Plaintiff's health or safety by, *e.g.*, shutting him in a sweltering bathroom, shattering glass near him, and forcing him to drink large volumes of liquid and eat live goldfish. Also, the argument ignores that hazing is defined in the disjunctive to include "inflict[ing] bodily injury" and that only the harm of "receiving bodily injury" (not reckless or intentional endangerment) gives rise to a civil action. Hence, the proposed rationale would not by itself provide a ground for decision.

– 15 –

vomiting—which Plaintiff endured after being forced by Defendants to drink copious amounts of milk and prune juice—is merely a bodily "reaction," not a bodily injury. Despite its initial appeal, this view is incorrect.

Courts give "bodily injury" its "everyday, ordinary meaning," including "'any detriment hurt, loss, impairment' that could fairly be considered an injury to the human body." *English v. Virginia*, 58 Va. App. 711, 718-19, 715 S.E.2d 391, 395 (Va. Ct. App. 2011). The "victim need not experience any observable wounds, cuts, or breaking of the skin," nor "offer proof of broken bones or bruises." *Id*. at 719, 715 S.E.2d at 395. "Bodily injury comprehends, it would seem, *any bodily hurt whatsoever*." *Id*. at 718, 715 S.E.2d at 395 (emphasis added). Simply put, vomiting certainly entails bodily hurt. *Chilton v. Commonwealth*, No. 1531-13-3, 2014 WL 6428394 (Va. Ct. App. Nov. 18, 2014), is also illustrative. There, the Virginia Court of Appeals reversed a strangulation conviction for lack of "bodily injury."

> [The victim] neither sought nor required medical attention, displayed no evidence of visible bruising or cuts, suffered no residual effects following the altercation, did not take or require medication, and did not testify to *suffering any type of pain* or stiffness *at the time of the altercation*.

*Id*. at *4 (emphasis added). This conclusion comports with the statement in *English* that suffering contemporaneous bodily pain or hurt constitutes bodily injury. Read liberally, then, one can infer from the Complaint that Plaintiff "suffered pain" and thus sustained bodily injury when he vomited.[11]

### 5.    Tortious Interference with Contractual Relations

This tort requires showing "(1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the

---

[11]    Similarly, and contrary to Defendant Pearce's assertion (dkt. no. 39 at 9), the facts alleged create a reasonable inference that Defendants caused this bodily injury by forcing Plaintiff to drink large quantities of liquid.

– 16 –

interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted." *Chaves v. Johnson*, 230 Va. 112, 120, 335 S.E.2d 97, 102 (1985). Plaintiff's conception of this claim appears to be: he had a contract to attend and swim at UVA; after he discussed the events at the Swim House with his coach, his teammates viewed him as a "rat"; his coach become concerned for his safety and had him practice apart from the team (although he remained on the team), and; eventually, Plaintiff left UVA (and by necessity the swim team). *See* Compl. ¶¶ 36-40; dkt. no. 47 at 10-12. Defendants contest the first, third, and fourth elements. The Court agrees that Count V has multiple shortcomings. The personal tort claims involved here are not a proper contractually-based business tort.

### a. Contract or business expectancy

Defendant Dudzinski argues that Plaintiff has not pled the existence of a contract or its terms. In response, Plaintiff claims "he had a contract to attend UVA, swim on its Varsity swim team, and study."

As a threshold matter, courts in Virginia are hesitant to find that the sorts of documents on which the Complaint relies—student handbooks, university policies, and codes of conduct— create a contract. *Doe v. Washington & Lee Univ.*, No. 6:14-CV-00052, 2015 WL 4647996, at *11 (W.D. Va. Aug. 5, 2015) (compiling cases); *see Dodge v. Trustees of Randolph-Macon Woman's Coll.*, 276 Va. 1, 6, 661 S.E.2d 801, 803 (Va. 2008) (holding various documents from university did not include contractual promise that it would not become co-educational). Additionally, the "terms of the contract must be clear, definite, and explicit," *Dodge*, 276 Va. at 5, 661 S.E.2d at 803, and, as Defendants Dudzinski and Pearce point out, the Complaint alleged only in conclusory terms that Plaintiff had a contract with UVA to "come to UVA to study and to

– 17 –

swim on its Varsity swim team." Compl. ¶¶ 20, 40. There is no explication of the length of the contract, its substantive content or terms, or when it was terminated. In short, a contract and its terms have not been adequately pled.

At oral argument, Plaintiff stated that his *business expectancy* was that of becoming a professional swimmer, which would be aided by attended a "swimming school." This theory was in neither the Complaint (which summarily alleged in Paragraphs 20, 40, and 54 a *contract with UVA*) nor Plaintiff's brief (which proclaimed the same). Moreover, the hope of becoming a professional athlete is too attenuated and too vague to serve as a basis for the first element, much less causation.

### b. Intentional interference causing breach

Defendant Dudzinski challenges causation, observing that "there are no allegations that allow one to infer how the defendants' actions caused or induced plaintiff to be unable to continue to study and swim at UVa" or "identifying which party to the contract—UVa or [Plaintiff]—may have actually breached the contract, or which provision(s) may have been breached." As the Complaint alleges at Paragraph 40, Plaintiff "left the school," not that UVA breached any alleged contract due to any actions by Defendants. In Defendant Rommel's words, "[n]othing in the Complaint indicates that [UVA] barred [Plaintiff] from swimming or competing;" rather, Plaintiff "chose to leave the UVA Swim Team." Because "a plaintiff cannot interfere with [his] own contract," *CVLR Performance Horses, Inc. v. Wynne*, 977 F. Supp. 2d 598, 603 (W.D. Va. 2013) (citing *Fox v. Deese*, 234 Va. 412, 427, 362 S.E.2d 699, 708 (Va. 1987)), this element fails as well. Even assuming one could reasonably infer from the Complaint that *UVA* breached the hypothetical contract, attributing the cause of that breach to Defendants is not supported by the Complaint. At most, Defendants merely subjected Plaintiff to social

– 18 –

hostility and ostracism because they thought he was a "rat"; there is no indication that *Defendants* conveyed that view to UVA's coach, or that they otherwise tried to convince anyone with the power to remove Plaintiff from the team or school to do so. Indeed, it was *Plaintiff's parents*, not Defendants, who told the coach that Defendants viewed Plaintiff as a rat. Compl. ¶ 37.

### c. Resulting damage

Plaintiff does not respond to Defendants' contention that the Complaint lacks allegations about how or to what degree he suffered damages. (*Compare* dkt. no. 35 at 9 *and* dkt. no. 39 at 11 *with* dkt. no. 47 at 10-12). The Complaint, in Paragraph 55, contains only a recital that "Plaintiff has suffered damages" from the conduct at issue.

### 6. Intentional Infliction of Emotional Distress

The elements of intentional infliction of emotional distress ("IIED") are: "[1] the wrongdoer's conduct is intentional or reckless; [2] the conduct is outrageous and intolerable; [3] the alleged wrongful conduct and emotional distress are causally connected; and, [4] the distress is severe." *Russo v. White*, 241 Va. 23, 26, 400 S.E.2d 160, 162 (Va. 1991). IIED claims are disfavored in Virginia. *Supervalu, Inc. v. Johnson*, 276 Va. 356, 370, 666 S.E.2d 335, 343 (Va. 2008); *Williams v. Agency, Inc.*, 997 F. Supp. 2d 409, 414 (E.D. Va. 2014); *Nelson v. Green*, 965 F. Supp. 2d 732, 752 (W.D. Va. 2013). The Court assumes without deciding that the first three elements are satisfied. The fourth element is not met here.

In *Russo*, plaintiff's allegations that she suffered stress, nervousness, and sleeplessness did not qualify as severe distress. 241 Va. at 28, 400 S.E.2d at 163; *see Harris v. Kreutzer*, 271 Va. 188, 205, 624 S.E.2d 24, 34 (Va. 2006) (allegations of "nightmares, difficulty sleeping, extreme loss of self-esteem and depression," and subsequent counseling did not state claim);

– 19 –

*Dixon v. Denny's, Inc.*, 957 F. Supp. 792, 796 (E.D. Va. 1996) (feeling "fearful and degraded" and suffering "headaches and vomiting" does not satisfy fourth element). The Complaint alleges Plaintiff suffered only the types of distress—*e.g.*, fear, disorientation, shame, humiliation, deliriousness—that fail as a matter of law. Defendants Pearce, Dudzinski, and Papendick provided extensive argument on this issue. Plaintiff's brief—while recounting the factual allegations at great length—lacks any argument on the "severity" element, asserting only that there was "emotional distress [that] was severe." Thus, the Court has not found any cases contrary to the authorities provided by Defendants showing that, *a fortiori*, the allegations here fail. As Defendant Dudzinski's reply (dkt. no. 56 at 3) summarizes, "Plaintiff does not—and, indeed, cannot—point to allegations in the Complaint of even the barest symptoms of emotional distress." The IIED claim must be dismissed.[12]

### 7. Punitive Damages[13]

Count VII is for punitive damages, which are "awarded only in cases of the most

---

[12]     At oral argument, the Court asked Plaintiff's counsel to identify what allegations could be made in an amended complaint that would show severe emotional distress. Counsel responded that Plaintiff suffered nightmares, is undergoing therapy, and has had difficulty swimming. Yet these are precisely the types of distress found not to be severe as a matter of law. Although the IIED claim will not be dismissed with prejudice at this early stage, and Plaintiff may seek leave to amend the Complaint, *see infra*, Plaintiff might take into consideration the authorities discussed above when considering whether to replead Count VI.

[13]     In Virginia, punitive damages are not a cause of action, but a remedy, and thus the request should not have been styled as a freestanding count. *Augustin v. SecTek, Inc.*, 807 F. Supp. 2d 619, 526 (E.D. Va. 2011). But Rule 8(e) requires the Court to construe the Complaint "so as to do justice," and because Rule 12(b)(6) only relates to motions to dismiss a "claim," it arguably does not apply to Plaintiff's remedial request for punitive damages. *See, e.g., Fravel v. Ford Motor Co.*, 973 F. Supp. 2d 651, 654-55 (W.D. Va. 2013); *Debord v. Grasham*, No. 1:14CV00039, 2014 WL 3734320, at *1 (W.D. Va. July 28, 2014). Still, courts can and do evaluate whether the facts alleged are legally sufficient to give rise to punitive damages, so the Court will do so here. *E.g., Boone v. Brown*, No. 7:13-CV-00230, 2013 WL 5416873, at *2-4 (W.D. Va. Sept. 26, 2013); *Madison v. Acuna*, No. 6:12-CV-00028, 2012 WL 4458510, at *4-7 (W.D. Va. Aug. 28, 2012)

egregious conduct." *Philip Morris, Inc. v. Emerson*, 235 Va. 380, 407, 368 S.E.2d 268, 283 (Va. 1988). "A claim for punitive damages at common law in a personal injury action must be supported by factual allegations sufficient to establish that the defendant's conduct was willful or wanton." *Woods v. Mendez*, 265 Va. 68, 76, 574 S.E.2d 263, 268 (Va. 2003). Such damages "are allowable only where there is misconduct or actual malice, or such recklessness or negligence as to evince a conscious disregard of the rights of others" *Condo. Servs., Inc. v. First Owners' Ass'n of Forty Six Hundred Condo., Inc.*, 281 Va. 561, 579, 709 S.E.2d 163, 174 (Va. 2011). The Court finds that the facts alleged would be sufficient to infer actual malice by Defendants toward Plaintiff, or that they consciously disregarded his rights.[14]

### 8. Common Law Conspiracy

"Under Virginia law, the elements of a common law civil conspiracy are (i) an agreement between two or more persons (ii) to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means, which (iii) results in damage to plaintiff" through an overt action done pursuant to the agreement. *William v. AES Corp.*, 28 F. Supp. 3d 553, 574 (E.D. Va. 2014); *Skillstorm, Inc. v. Elec. Data Sys., LLC*, 666 F. Supp. 2d 610, 618 (E.D. Va. 2009). There must also be an underlying tort committed. *William,* 28 F. Supp. 3d at 574. Defendants—particularly Defendant Rommel—argue that there are insufficient facts to support an agreement or unity of purpose. Specifically, it is claimed that the Complaint contains "conclusory allegations" of mere "parallel conduct." (Dkt. no. 43 at 10-13). To the contrary, the Complaint does provide enough

---

[14]     Arguing *a fortiori*, Defendant Rommel points to *Green v. Ingram*, 269 Va. 281, 285-86, 608 S.E.2d 917, 919-220 (Va. 2005), in which punitive damages were not proven when a SWAT team officer fired shots through a door and killed a woman inside trying to protect her child. But *Green* is not illustrative because it turned on the fact that the defendant lacked knowledge that the woman's death would result from his actions, as he was unaware she was on the other side of the door. Moreover, each punitive damages case "must be evaluated on its own facts." *Id.* at 292, 608 S.E.2d at 923.

– 21 –

factual material on this issue.

The Complaint specifically alleges that all Defendants, by name, conspired together to draft and send the Mr. Mean emails regarding Welcome Week. The content of those emails is then recounted in detail. Not coincidentally, Defendants Dudzinski and Papendick earlier mentioned to Plaintiff and the other first-years that Welcome Week would take place. And when Plaintiff arrived at the Swim House for Welcome Week as instructed by Mr. Mean, Defendants behaved in a manner one would expect from the creators of that crass persona, even making unique threats—*e.g.*, the "dry-ice dildo" treatment—contained in the emails that would only have been known to its authors. All of this shows that, as alleged, Defendants worked together to send the Mr. Mean emails, knew their content and plan, and orchestrated and directly participated in the Swim House ritual. Furthermore, the Complaint alleges that Defendants "were the organizers" of the Swim House event who "instigated" a slew of allegedly tortious activity, described in detail. Compl. ¶ 26. And the events inside the Swim House were not "spontaneous, parallel action" caused by partygoers who "got out of hand," as Rommel claims. Rather, it took significant time, effort, and planning for Defendants to, among other things, procure buckets to place on the first-years' heads; obtain large containers of alcohol and other liquids to be consumed; duct-tape shut or block all exits or drains of the bathroom in which Defendants would falsely imprison Plaintiff; draft detailed and embarrassing questionnaires; compile a scavenger hunt list; and purchase goldfish ignominiously condemned to death-by-mastication. Compl. ¶¶ 26(vii), (xvii), (xxv)-(xxvii), (xlv)-(xlvi), (xlvii); *see* Dante Alighieri, *Inferno*, canto XXXIV. All told, the facts alleged are sufficient to establish a common law civil conspiracy.

9.     **Statutory Conspiracy under Va. Code §§ 18.2-499 & -500**

– 22 –

By statute, "two or more persons who combine, associate, agree, mutually undertake or concert together for the purpose of . . . willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever" are jointly and severally guilty of a misdemeanor. Va. Code § 18.2-499(A)(i). "Any person . . . injured in his reputation, trade, business or profession by reason of [such] a violation of § 18.2-499" has a private right of action for treble damages and the costs of the suit, including reasonable attorneys' fees. Va. Code § 18.2-500.

"Despite its broad language, it is well-settled that this statute applies only to injuries 'to business and property interests, not to personal or employment interests.'" *Shirvinski v. U.S. Coast Guard*, 673 F.3d 308, 321 (4th Cir. 2012) (quoting *Andrews v. Ring,* 266 Va. 311, 585 S.E.2d 780, 784 (Va. 2003)) (dismissing tort claim "cloaked" as a business conspiracy).

> In an unbroken line of federal district cases, . . . the federal district courts in Virginia have consistently held that a right of action is afforded [under these statutes] only when malicious conduct is directed at one's *business,* not one's *person,* and that the statute focuses upon conduct directed at property, *i.e.,* one's business and applies only to conspiracies resulting in business-related damages.

*Buschi v. Kirven*, 775 F.2d 1240, 1259 (4th Cir. 1985) (emphasis in original, internal quotations, citations, and footnotes omitted); *see Warner v. Buck Creek Nursery, Inc.*, 149 F. Supp. 2d 246, 267 (W.D. Va. 2001) ("In order to state a claim under Section 18.2–499, courts have held that the conspiracy must be one to injure the plaintiff 'in his business.'").

Perhaps for this reason, federal district courts in Virginia have required that a conspiracy under this statute be pled, like fraud, with particularity (which has not been done here). *E.g., Schlegel v. Bank of Am., N.A.*, 505 F. Supp. 2d 321, 329 (W.D. Va. 2007) (quoting *Gov't Employees Ins. Co. v. Google, Inc.*, 330 F. Supp. 2d 700, 706 (E.D. Va. 2004)). Courts have reduced the elements of this claim to "(1) concerted action between two or more people; (2) legal

– 23 –

malice towards Plaintiff's business; and (3) that the conspiratorial actions caused Plaintiff's business damages." *Jaggars v. Sandy Spring Bank*, No. 6:14-CV-00015, 2015 WL 1648556, at *2 (W.D. Va. Apr. 14, 2015) (quoting *Rogers v. Deane*, 992 F. Supp. 2d 621, 635 (E.D. Va.) *aff'd*, 594 F. App'x 768 (4th Cir. 2014)); *see Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 108 F.3d 522, 526 (4th Cir. 1997).

Plaintiff alleges that Defendants' actions injured him in "his business and property" by causing the "destruction of [his] valuable swim contract with UVA." Compl. ¶ 69. But Plaintiff fails to respond to Defendants' arguments that this allegation is legally insufficient.[15] Defendant Dudzinski (and to a lesser extent Rommel) rely on *Shirvinski* and *Warner*, *supra*, in urging that Plaintiff's claim involves merely a personal interest, not a business one. The Complaint bears this out: Besides the conspiracy counts, Plaintiff's claims and the underlying conduct sound in torts of personal injury, not business harm. In *Shirvinski*, the Fourth Circuit observed that "because injury to personal reputation ordinarily causes damage to one's business or profession, nearly every defamation action would fall within the statute's ambit if we permitted such claims to proceed." 673 F.3d at 321. But "Virginia's business conspiracy statute was not designed to provide treble damages for defamation suits cloaked as conspiracy claims." *Id*. Similarly, nor was it designed to provide treble damages for the personal injury torts alleged here.

Dudzinski also contends that "an athletic financial aid agreement is not a business or property interest" under the statute. Cases widely hold that college athletic scholarships and

---

[15] After reciting the elements, his brief asserts in a single sentence and without any supporting authority that he "has a property interest in the athletic scholarship that he was awarded by the University of Virginia." (Dkt. no. 47 at 20).

participation in collegiate athletics are not cognizable property interests.[16]  *E.g.*, *Equity in Athletics, Inc. v. Dep't of Educ.*, 675 F. Supp. 2d 660, 680-81 (W.D. Va. 2009) (compiling cases holding that participation in collegiate athletics is a privilege, not a property right, and finding no support in Virginia to the contrary) *aff'd*, 639 F.3d 91, 109 (4th Cir. 2011); *Spath v. NCAA*, 728 F.2d 25, 29 (1st Cir. 1984) (rejecting assertion that scholarship provided a contractual property interest in playing hockey).[17]  And as discussed regarding the tortious interference with contract claim, the Complaint lacks the necessary details about the alleged interest harmed (*i.e.*, the purported UVA contract, its terms, and when it was terminated) and suffers from a failure of causation.

Finally, Defendant Pearce builds on his co-Defendants' positions by arguing that Plaintiff's so-called "swim contract with UVA" was, at most, a *future* business interest that is not cognizable under the statute.  *Warner*, 149 F. Supp. 2d at 267-68 (compiling cases and holding

---

[16]     Moreover, that amateurism—as opposed to a participant's pecuniary business interest—is at the heart of college athletics has been established since the Supreme Court ruled in *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 102 (1984) that "to preserve the character and quality of [college sports,] athletes must not be paid, must be required to attend class, and the like."  While somewhat vogue to characterize that language as dictum, *e.g.*, *O'Bannon v. NCAA*, 802 F.3d 1049, 1062-63 (9th Cir. 2015), the view is incorrect.  Dicta "is defined as those portions of an opinion that are not necessary to deciding the case."  *United States v. Kaley*, 579 F.3d 1246, 1253 n.10 (11th Cir. 2009); *see United States v. Barela*, 797 F.3d 1186, 1190 (10th Cir. 2015); *cf. Cornejo-Barreto v. Siefert*, 379 F.3d 1075, 1082 (9th Cir. 2004) (recounting Ninth Circuit's inability *en banc* to even agree on a definition of dicta).  Contrariwise, the statement in *Board of Regents* was necessary to the Supreme Court's analysis and resulting conclusion that NCAA rules should not be subjected to per se antitrust scrutiny.

[17]     *See also Fluitt v. Univ. of Nebraska*, 489 F. Supp. 1194, 1202-03 (D. Neb. 1980) (finding no property interest in college athletics scholarship); *Awrey v. Gilbertson*, 833 F. Supp. 2d 738, 741-42 (E.D. Mich. 2011) (no property interest to participate in college sports); *Hall v. NCAA*, 985 F. Supp. 782, 799 (N.D. Ill. 1997) ("there is no property or liberty interest in participating in interscholastic athletics"); *Kulovitz v. Illinois High Sch. Ass'n*, 462 F. Supp. 875, 877-78 & n.5 (N.D. Ill. 1978) ("Participation in interscholastic athletics is not a constitutionally protected civil right"; "An expectation of an athletic scholarship interest does not amount to a property interest").

– 25 –

that "unspecified future business endeavor" is not sufficient).  For instance, Plaintiff alleges he "was going to use his college training *as a basis* for swimming professionally or even *try* to compete in the Olympics," so his school choice would "greatly impact those *possible* professional pursuits" and "determine *if* he would swim professionally after he graduated." Compl. ¶ 16 (emphasis added).  This also comports with Plaintiff's description at oral argument of his tortious interference claim, which he asserted was built upon attending a "swimming school" to springboard him into the professional ranks.  To the extent, then, that Plaintiff's alleged business interest is not simply his "swim contract" with UVA but the hope of becoming a professional athlete, it is a future business interest that is not cognizable.

### 10.    Negligence

Defendant Rommel seeks dismissal of the negligence count.  His sole argument is the assertion that the Complaint provides no facts showing he "violated some common law duty as to Plaintiff so as to constitute negligence."  This passing mention of Count X is insufficient to place the issue before the Court, and in any event the Complaint contains ample facts to state a negligence claim.

### III.    PLAINTIFF'S REQUEST FOR LEAVE TO AMEND

At the end of his response brief, Plaintiff appended a request for leave to amend his Complaint if any count is dismissed.  Plaintiff cites the "federal rule policy" of deciding cases on the merits and allowing "at least one amendment regardless of how unpromising the initial pleading appears." *Ostrzenski v. Seigel*, 177 F.3d 245, 253 (4th Cir. 1999).  Defendants oppose this request, with Defendant Dudzinski doing the heavy lifting.  He argues that leave to amend should not be granted on Counts II (battery), V (tortuous interference with contract), VI (intentional infliction of emotional distress), and IX (statutory conspiracy) on the grounds of

futility.

Ordinarily, Rule 15(a)(2) would permit amendment upon "the court's leave," which should freely be given "when justice so requires." However, the Court's pretrial order of July 29, 2015 provides that any such motion must be filed within 45 days from that date "[e]xcept for good cause shown." (Dkt. no. 14 ¶ 24). That deadline expired over three months ago, on September 14, 2015.

When a motion to amend the complaint is filed "after the deadline set by the scheduling order for amending pleadings, Federal Rule of Civil Procedure 16(b) applies [not Rule 15(a)(2)]. Under Rule 16(b) a motion to amend a complaint filed after a scheduling order deadline shall be granted only upon a showing of 'good cause.'" *Montgomery v. Anne Arundel Cnty., Md.*, 182 F. App'x 156, 162 (4th Cir. 2006); *see Nourison Rug Corp. v. Parvizian*, 535 F.3d 295, 298 (4th Cir. 2008); *Wooton v. CL, LLC*, 504 F. App'x 220, 223 (4th Cir. 2013). "Rule 16(b)'s good cause standard emphasizes the diligence of the party seeking amendment." *RFT Mgmt. Co., LLC v. Powell*, 607 F. App'x 238, 242 (4th Cir. 2015).

Because Plaintiff has filed neither (1) a proposed amended complaint which the Court could assess for futility nor (2) a formal motion attempting to make the required showing under Rule 16(b), leave to amend will not be given as a matter of course. The Court will not speculate whether a hypothetical amended complaint would be futile, or whether the good cause standard is met. The former point is especially salient given that some of Plaintiff's claims have been found to rest on faulty legal grounds and not mere pleading defects. Regardless, without prejudging the matter should Plaintiff subsequently submit a formal motion and proposed amended complaint, the instant request for leave to amend will be denied.

**CONCLUSION**

– 27 –

For the foregoing reasons, Defendants' motions to dismiss will be granted in part and denied in part. Plaintiff's request for leave to amend will be denied without prejudice to his right to seek amendment through a formal motion and proposed amended complaint. An appropriate order will issue. The Clerk is requested to circulate a copy of this opinion to all counsel of record.

Entered this __17th__ day of December, 2015.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE